UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDELBROCK, LLC, | Case No. 1:19-cv-01502-DAD-EPG |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS REGARDING CLAIM CONSTRUCTION** |
| v. | |
| WHIPPLE INDUSTRIES, INC, doing business as Whipple Superchargers, | (ECF Nos. 40, 44, 45, 47, 48) |
| Defendant**.** | |

## I.   INTRODUCTION

Plaintiff Edelbrock, LLC ("Edelbrock") filed this action against Defendant Whipple Industries, Inc. doing business as Whipple Superchargers ("Whipple") alleging infringement of United States Patent No. 9,683,481 (the "'481 Patent"), pursuant to the United States Patent Act, 35 U.S.C. § 1 *et seq.* (ECF No. 1.)

This matter is before the Court on the parties' competing briefs regarding claim construction of five terms in the '481 Patent. (ECF No. 40.) The parties filed their principal claim construction briefs on September 11, 2020, and their responsive claim construction briefs on October 1, 2020. (ECF Nos. 44-45, 47-38.) The Court held a claim construction hearing on October 15, 2020. (ECF Nos. 53, 54.) The Court has considered the parties' briefs and all other

1  relevant documents, as well as the parties' arguments at the hearing, and recommends construing
2  the disputed claims as set forth below.

3                                    **II.       BACKGROUND**

4          The '481 Patent is titled "Dual Pass Intercooled Supercharger." (ECF No. 44-2 at 2.) Chad
5  Magana and Robert Simons are the inventors and Edelbrock is the applicant and assignee. (*Id.*)
6  Edelbrock filed its patent application on March 22, 2016, and the '481 Patent was issued on June
7  20, 2017. (*Id.*; ECF No. 45-6 at 2-10.)

8          The '481 Patent is "directed to a dual pass intercooled supercharger and method of
9  compressing and cooling air to an engine intake." (ECF No. 1 at 3.) The dual pass intercooled
10  supercharger is described as "including a supercharger; and an intercooler in fluid communication
11  with an exit of the supercharger, the intercooler configured as a dual pass heat exchanger." (ECF
12  No. 44-2 at 10.) A dual pass heat exchanger "is defined as a heat exchanger where the fluid
13  passing through the exchanger passes through the heat exchanger more than once." (*Id.* at 12.) Air
14  is compressed in a supercharger and then passed through "a first portion of an intercooler in fluid
15  communication with an exit of the supercharger[.]" (*Id.* at 10.) The air then exits the intercooler
16  into a common chamber and is passed through a second portion of the intercooler different from
17  the first portion. (*Id.*.) "A heat exchange medium" such as water or coolant "may be in fluid
18  communication between the first portion and the second portion of the heat exchanger." (*Id.*) The
19  supercharger and intercooler "may be integrated into a single housing or may be separate." (*Id.* at
20  12.)

/// 
/// 
/// 
/// 
/// 
/// 
/// 
/// 
///



FIG. 4

Figure 4 depicts a cross section of an exemplary dual pass intercooled supercharger [30]. (ECF No. 44-2 at 11.) In this exemplary embodiment, a housing [32] encloses and directs air from the supercharger chambers [34] to the intercooler [36] and out the runners [40] to the engine. (*Id.*) The supercharger compresses the air, which enters the central chamber [48] toward the intercooler [36]. (*Id.*) A seal [44] prevents the air from bypassing the intercooler and the air is directed through a first portion of the intercooler [36a] and into a chamber [32] between the intercooler and the housing. (*Id.*) The air then passes through a second portion of the intercooler [36b] and enters the engine through runners [40]. (*Id.*)

///

///

///

///

///

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14



FIG. 5

15    Figure 5 "illustrates an exemplary enclosure of the dual pass intercooler supercharger"

16 with a housing [32], "an air inlet [52], a plurality of air outlets [54] on opposing sides of the

17 housing and a water inlet [56] and water outlet [58]. (ECF No. 44-2 at 12.) In this exemplary

18 embodiment, the air inlet [52], water inlet [56], and water outlet [58] are positioned on the same

19 side of the housing [32]. (*Id.*) The water inlet [56] injects water into the second portions of the

20 intercooler described above, travels along the length of the intercooler, combines at the opposing

21 end, and returns through the central portion of the intercooler and out the water outlet [58]. (*Id.*)

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28

4



FIG. 6

Figure 6 "illustrates an exemplary top view of the intercooler exchanger including an exemplary heat exchange medium flow path from an exemplary inlet to an exemplary exit." (ECF No. 44-2 at 11.) In this exemplary embodiment, an inlet [56] is separated into two inlets [56a and 56b] at the heat exchanger and one outlet [58]. (*Id.* at 11-12.) Seals [60] divide the heat exchanger into first and second portions to permit the dual pass through the heat exchanger. (*Id.* at 12.) The exchange medium flow path may be reversed or redirected to accomplish a specific design purpose. (*Id.* at 11-12.)

///

///

///

///

///

///

///

5

On October 27, 2017, Whipple petitioned the United States Patent and Trademark Office ("USPTO") for an *ex parte* reexamination of the '481 Patent. (ECF No. 48-9.) Whipple requested reexamination based upon a YouTube video and an associated declaration, U.S. Pre-grant Publication 2010/0108040 to Simons et al., WO 2015/179048 to Callaway et al. ("Callaway"), and U.S. Pat. No. 7,213,639 to Daniellson et al. (*Id.*) The USPTO accepted the request to reexamine the '481 Patent and Edelbrock submitted a response. (ECF No. 45-7 at 46-79.) The USPTO subsequently issued a final rejection. (ECF No. 48-10.) Edelbrock requested reconsideration on November 5, 2018 and submitted claim amendments and supporting arguments. (ECF No. 48-11.) The USPTO found the amended claims patentable and issued a reexamination certificate on January 15, 2019. (ECF No. 48-12; ECF No. 44-5.)[1]

Edelbrock filed this action on October 23, 2019, alleging violations of claims 1 and 17 of the '481 Patent and seeking a permanent injunction, lost profit damages, and a finding of willful patent infringement. (ECF No. 1.) The parties agreed to constructions for three terms in claims 1 and 17 of the '481 Patent while five terms or phrases remain in dispute. (ECF No. 40.)

## III.   LEGAL STANDARDS

### A.   Key Patent Concepts

A patent must "describe the exact scope of an invention and its manufacture to secure to the patentee all to which he is entitled and to apprise the public of what is still open to them." *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996). A patent application must contain a "specification" and at least one drawing. 35 U.S.C. § 111. There are two distinct parts of a patent specification. The first is a detailed "written description of the invention and of the manner and process of making and using it," set forth "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." 35 U.S.C. § 112(a). The written description also "shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." *Id*. Second, a patent "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(b). The claims define the scope of a patent

---

[1]      Edelbrock's responsive brief also notes that, on September 11, 2020, Whipple filed a second request for reexamination, again relying on YouTube and Callaway, among other references. (*see* ECF Nos. 48 at 8, 48-13.) It appears that this request remains pending with the USPTO.

grant, *Markman*, 517 U.S. at 372, but "do not set forth the invention in all of the detail required by the written description." *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, No. 03 CIV. 842 (TPG), 2004 WL 1145833, at *3 (S.D.N.Y. May 20, 2004).

Consistent with the "best mode" requirement of 35 U.S.C. § 112, patents disclose "embodiments" and "preferred embodiments" of the claimed invention, the purposes of which are "to provide a disclosure to the public of [the inventor's] best mode of carrying out the invention when the applications were filed." *Constr. Tech., Inc. v. Cybermation, Inc*., 965 F. Supp. 416, 431 (S.D.N.Y. 1997). Such a disclosure is included for the benefit of the public, rather than to limit the scope of the invention. *Id.*; *see also Martin v. Barber*, 755 F.2d 1564, 1567 (Fed. Cir. 1985) (explaining that "[i]nfringement, either literal or by equivalence, is determined by comparing the accused device with the claims in suit, not with a preferred or commercial embodiment of the patentee's claimed invention").

## B.   Patent Claim Construction

Claim construction is a matter of law, reserved entirely for the Court. *See Markman*, 517 U.S. at 372; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Terms contained in claims are "generally given their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582. "There are only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw PLC v. Marposs Societ' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249. To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir.

2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005); *see also Vitronics*, 90 F.3d at 1582. A court may also consider extrinsic evidence, such as a dictionary definition. *Id.* at 1317. "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "Claims speak to those skilled in the art," but "[w]hen the meaning of words in a claim is in dispute, the specification and prosecution history can provide relevant information about the scope and meaning of the claim." *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (citations omitted). "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. "However, claims are not to be interpreted by adding limitations appearing only in the specification." *Electro Med.*, 34 F.3d at 1054. "Thus, although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *Id.*; *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if

8

it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Finally, the court may consider the prosecution history of the patent. *Markman*, 52 F.3d at 980. The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotations omitted).

In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. However, "it is entirely appropriate . . . for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. All extrinsic evidence should be evaluated in light of the intrinsic evidence, *Phillips*, 415 F.3d at 1319, and courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernible from examination of the claims, the written description, and the prosecution history. *Pitney Bowes*, 182 F.3d at 1308. While extrinsic evidence may guide the meaning of a claim term, such evidence is less reliable than intrinsic evidence. *Phillips*, 415 F.3d at 1318-19.

## IV.   CLAIM CONSTRUCTION TERMS

The parties have agreed to constructions for three terms in claims 1 and 17 of the '481 Patent while five terms or phrases remained in dispute. (ECF No. 40.) Specifically, the parties agree to constructions of the following three claim terms:

///

///

9

| Term | Claims | Parties' Agreed Construction |
|---|---|---|
| an/the intercooler | 1, 17 | a/the cooling device |
| a single heat exchanger | 1, 17 | one heat exchanger |
| on a same side of the dual pass intercooled supercharger | 1, 17 | on a front side of the dual pass intercooled supercharger |

(ECF No. 40.)

The parties dispute the following five claim terms:

| Term | Claims | Edelbrock's proposed construction | Whipple's proposed construction |
|---|---|---|---|
| A first portion of a heat exchange surface | 1 | No construction necessary – ordinary meaning | A first volume of the heat exchanger |
| A second portion of a heat exchange surface | 1 | No construction necessary – ordinary meaning | A second volume of the heat exchanger different from the first volume |
| Overlap | 1 | No construction necessary – ordinary meaning | Extend over so as to cover partly |
| From an inlet to an outlet across the heat exchanger | 1, 17 | No construction necessary – ordinary meaning | From an inlet of the heat exchanger to an outlet of the heat exchanger *[revised proposed construction]* |
| An inlet and an outlet of the heat exchange fluid medium | 1, 17 | No construction necessary – ordinary meaning  Alternatively, "a fluid medium inlet and outlet of the heat exchanger" | An inlet and outlet of the supercharger housing *[revised proposed construction]* |

(ECF Nos. 40, 44, 45, 47, 48.)

The disputed terms are from claims 1 and 17 of the '481 Patent, which state:

1.  A dual pass intercooled supercharger, comprising:

    [a] a housing;

    [b] a front drive, front inlet supercharger;

    [c] an intercooler in fluid communication with an exit of the supercharger, the intercooler configured as a dual pass heat exchanger having an

10

airflow path from the supercharger that passes through the heat exchanger, defining a heat exchange area, more than once,

[d]  wherein the dual pass heat exchanger is a single heat exchanger in which a heat exchange medium is in fluid communication ***from an inlet to an outlet across the heat exchanger*** and defining a flow path perpendicular to the air flow path through the heat exchange area,

[e]  wherein the heat exchanger is configured such that the airflow path from the supercharger contacts ***a first portion of a heat exchange surface of the heat exchanger***, leaves the heat exchange area, and reenters the heat exchange area to contact ***a second portion of the heat exchange surface*** separate from the first portion, the first portion and second portion of the intercooler ***overlap*** in a depth dimension along an air flow direction, and

[f]  wherein the second portion comprises two second portions, one of the two second portions is on a first side of the first portion and another of the two second portions is on a second side of the first portion opposite the first [portion] side;

[g]  wherein ***an inlet and an outlet of the heat exchange fluid medium*** and an inlet of the air flow through the supercharger and a supercharger pulley are on a same side of the dual pass intercooled supercharger; and

[h]  a first seal to prevent air from bypassing the intercooler positioned between the first portion and the second portion of the heat exchanger.

. . . .

17.  A method of compressing and cooling air to an engine intake, comprising:

[a]  compressing the air in a front drive, front inlet supercharger;

[b]  passing the air exiting the supercharger through a first portion of an intercooler in fluid communication with an exit of the supercharger;

[c]  exiting the air from the first portion of the intercooler into a common chamber;

[d]  passing the air from the common chamber through a second portion of the intercooler different from the first portion of the intercooler, the air directed in opposite directions when passing the first portion of the intercooler and when passing the second portion of the intercooler, wherein

[e]  the intercooler defines a single heat exchanger in which a heat exchange medium is in fluid communication ***from an inlet to an outlet across the heat exchanger*** and defines a flow path perpendicular to the air flow path through the heat exchange area,

[f]  a heat exchange medium of the intercooler is in fluid communication between the first portion and the second portion,

[g]  a heat exchange medium flow path through the first portion and the second portion is perpendicular to an air flow path through the first portion and the second portion, and

[h]  the second portion comprises two second portions, one of the two second portions is on a first side of the first portion and another of the two second portions is on a second side of the first portion opposite the first side and a

11

seal positioned between the first portion and the second portion prevents air from bypassing the intercooler,

[i] wherein ***an inlet and an outlet of the heat exchange fluid medium*** and an inlet of the air flow through the supercharger and a supercharger pulley are on a same side of the dual pass intercooled supercharger.

(ECF No. 44-5 at 3 (emphasis and paragraph lettering added).)

## V.     DISCUSSION

### A.     Failure to Include Prior Art and Prosecution History in Joint Statement

As a preliminary matter, Edelbrock argues that the Court should disregard Whipple's arguments regarding prior art and the '481 Patent's prosecution history because they are untimely and violate the Northern District of California's Patent Local Rules ("PLR"). (ECF No. 48 at 9-13.) Edelbrock notes that the parties' Joint Scheduling Report proposed that the Court apply the PLR for purposes of claim construction. (*Id.* at 4.)

PLR 4-2 provides, in relevant part, that "each party shall . . . identify all references from the specification or prosecution history that support its proposed construction" at the same time that the parties exchange their respective Preliminary Claim Constructions. Patent L.R. 4-2(b) (N.D. Cal. Nov. 4, 2020). Additionally, pursuant to PLR 4-3, the parties are required to complete and file a Joint Claim Construction and Prehearing Statement which contains, among other things, an identification of all references from the specification or prosecution history that support each party's proposed construction. *Id.* at 4-3(b).

According to Edelbrock, Whipple failed to identify any prior art or prosecution history when the parties exchanged Preliminary Claim Constructions pursuant to PLR 4-2 and the failure to do so violated PLR 4-2(b) and PLR 4-3. (ECF No. 48 at 9-13.) Thus, Edelbrock requests that the Court decline to consider Whipple's discussion of prior art and prosecution history. (*Id.*)

The PLR do not specify the actions that the Court may or must take if the parties do not comply with the enumerated requirements. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1363 (Fed. Cir. 2006). It also is unclear whether and to what extent these rules are binding on this Court. Nonetheless, the Court considers Edelbrock's objection on the merits.

Because Whipple did not properly disclose the prior art and prosecution history as supporting its proposed construction, this material "must be stricken or excluded unless [Whipple's] failure was 'substantially justified or harmless.'" *Asia Vital Components Co. v.*

12

*Asetek Danmark A/S*, 2018 WL 452109, at *2 (N.D. Cal. Jan. 17, 2018) (quoting Fed. R. Civ. P. 37(c)(1)). Whipple does not appear to dispute that it failed to identify the prior art and prosecution history in violation of PLR 4-2(b) and PLR 4-3 and offers no justification for the timing of its disclosure.

As to whether the failure was harmless, Edelbrock contends that it was prejudiced because its "first brief does not address Whipple's primary evidence, while Whipple has two chances to explain its prior art and prosecution arguments." (ECF No. 48 at 9.) The Court notes that Edelbrock's responsive brief thoroughly addressed Whipple's prior art and prosecution history arguments. At the claim construction hearing, the Court also asked if Edelbrock would like additional time and an opportunity to submit supplemental briefing and Edelbrock declined. (*See* ECF No. 54 at 8-9.) Thus, although Edelbrock objects to the late disclosure, it has been given an opportunity to cure any prejudice that may have resulted from Whipple's untimely disclosure. As Edelbrock has declined this opportunity, it appears that the harm at issue does not rise to the level of prejudice necessary to warrant exclusion. The Court will therefore consider Whipple's arguments and evidence regarding prior art and the prosecution history in construing the disputed terms as discussed further below.

**B.      Construction of "a first portion of a heat exchange surface" and "a second portion of a heat exchange surface"**

| Term | Claims | Edelbrock's proposed construction | Whipple's proposed construction |
|------|--------|-----------------------------------|---------------------------------|
| A first portion of a heat exchange surface | 1 | No construction necessary – ordinary meaning | A first volume of the heat exchanger |
| A second portion of a heat exchange surface | 1 | No construction necessary – ordinary meaning | A second volume of the heat exchanger different from the first volume |

The Court considers the first and second disputed terms, both from claim 1[e], together. Claim 1[e] recites:

> wherein the heat exchanger is configured such that the airflow path from the supercharger contacts ***a first portion of a heat exchange surface of the heat exchanger***, leaves the heat exchange area, and reenters the heat exchange area to contact ***a second portion of the heat exchange surface*** separate from the first

13

portion, the first portion and second portion of the intercooler overlap in a depth dimension along an air flow direction;

(ECF No. 44-5 at 3 (emphasis added).)

Edelbrock argues that these terms do not need construction because the word "portion" has an understood meaning as "a part of any whole, either separated from or integrated with it." (ECF No. 44 at 11.) Further, the dictionary definition of the word "portion" is consistent with the context of claim 1[e], and on its face claim 1[e] indicates that the airflow will contact a first part of the heat exchanger's surface and then contact a second part of the heat exchanger's surface. (*Id.* at 11-12.)

Whipple argues that the claim language, specification, prosecution history, and prior art all require the first and second portions of the heat exchange surface to be a separate "volume" of the same heat exchanger. (ECF No. 45 at 13-16.)[2] According to Whipple, the terms "first portion" and "second portion" of the heat exchange surface mean a first volume and a second volume of the same single heat exchanger. (*Id.*; ECF No. 47 at 8-9.)

The Court disagrees with Whipple's proposed construction and does not find that "portion" means a three-dimensional "volume." As Edelbrock contends, the word "portion" has an understood meaning as "a part of any whole, either separated from or integrated with it." (ECF No. 44-6) *Dictionary.com*, https://www.dictionary.com/browse/portion (last visited Dec. 16, 2020); *see also* Portion, *Oxford English Dictionary* (3d ed. 2006) (defining "portion" as "[a]n allocation, a share" or "[a] part of any whole; a section; a division; a proportion, a fraction."); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("[I]n determining the ordinary and customary meaning of the claim term as viewed by a person of ordinary skill in the art, it is appropriate to consult a general dictionary definition of the word for guidance."); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103. F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction "is not an obligatory exercise in redundancy); *O2 Micro Int'l Ltd. V. Beyond Innovation Tech.. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves

---

[2] As part of this argument, Whipple contends that there is a dispute about whether the first and second portions are of the same heat exchanger. (ECF No. 45 at 13-16; ECF No. 47 at 8.) However, Edelbrock does not appear to argue that more than one heat exchanger is at issue. (*See* ECF No. 44 at 11-12; ECF No. 48 at 10.) To the contrary, Edelbrock explicitly agrees that a single heat exchanger means one heat exchanger. (ECF No. 40 at 2.)

1    little more than the application of the widely accepted meaning of commonly understood words.")

2    (internal citations and quotation marks omitted).

3          Whipple argues that "the claims and specification make clear [that] the first and second

4    portions are three-dimensional volumes." (ECF No. 45 at 14.) In support, Whipple cites to the

5    '481 Patent specification, which describes the "portions" as follows:

6          The air leaving the supercharger is then directed through the intercooler 36. The
           intercooler is configured such that the supercharger air traverses a *first portion* of
7          the intercooler *through a first volume*. The air enters the intercooler along a
           *portion of a first sid*e and exits along *an opposing second side*. . . . The air enters
8          *the second portion* of the intercooler *from the second side* (i.e. *the exit side* from
           the first air pass). The air then exits the intercooler a second time *on the first side*.
9          The second pass of the air is *through a second volume different from the first
           volume*, such that the air passes through different lengths of the intercooler. Once
10         the air has traversed the intercooler twice, the cooled air travels along the runners
           40 to the engine.
11
12   (ECF No. 44-2 at 11 (emphasis added).)

13         Whipple points out that the specification differentiates between "portions," which

14   Whipple contends are three-dimensional, and "sides," which Whipple contends are two-

15   dimensional. (ECF No. 45 at 14-15; ECF No. 47 at 8-9.) Whipple also notes that claim 1

16   distinguishes between portions and sides. (ECF No. 47 at 8 (citing claim 1[f] (requiring "one of

17   the two second portions is on a front side of the first portion and another of the two second

     portions is on a second side."))).) Whipple contends that this demonstrates that portion means a
18
     three-dimensional volume. The Court disagrees.
19
           The use of both "side" and "portion" in the specification does not support the conclusion
20
     that "portion" is three-dimensional and is synonymous with "volume." Indeed, such a conclusion
21
     would ignore the fact that the specification distinguishes between the terms "portion" and
22
     "volume," and would fail to give separate meaning to these terms. A construction that gives a
23
     separate meaning to the specification terms "side," "portion," and "volume," is preferred and the
24
     Court finds that such a construction is also consistent with the ordinary meaning of the term
25
     "portion," as discussed above. *See Merck & Co. v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1372
26
     (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is
27
     preferred over one that does not do so.")*; Comaper Corp.*, 596 F.3d at 1348 (while not
28
     conclusive, "[t] here is an inference . . . that two different terms used in a patent have different

                                                    15

meanings"); *see also Thorner*, 669 F.3d at 1365 ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history.").

In sum, the Court finds that there is no construction necessary for the terms "a first portion of a heat exchange surface of the heat exchanger," and "a second portion of the heat exchange surface," and recommends that the terms should be given their ordinary meaning.

## C.    Construction of "overlap"

| Term | Claims | Edelbrock's proposed construction | Whipple's proposed construction |
|------|--------|-----------------------------------|---------------------------------|
| Overlap | 1 | No construction necessary – ordinary meaning | Extend over so as to cover partly |

The third disputed term comes from claim 1[e], which recites:

> wherein the heat exchanger is configured such that the airflow path from the supercharger contacts a first portion of a heat exchange surface of the heat exchanger, leaves the heat exchange area, and reenters the heat exchange area to contact a second portion of the heat exchange surface separate from the first portion, the first portion and second portion of the intercooler ***overlap*** in a depth dimension along an air flow direction

(ECF No. 44-5 at 3 (emphasis added).)

In its briefing, Edelbrock argues that the term "overlap," which describes the first and second portion of the heat exchanger, requires no construction because it is a word used in everyday language and nothing in the specification indicates that the patentee meant to give the term "overlap" anything other than its plain and ordinary meaning. (ECF No. 44 at 13-14; ECF No. 48 at 15-16.)

Whipple contends that Edelbrock has not alleged that "overlap" has some special meaning within the automotive field different from its plain dictionary definition, or that it acted as its own lexicographer to specially define the term. (ECF No. 45 at 19-20; ECF No. 47 at 11-13.) Thus, "overlap" should be construed according to its plain meaning in the dictionary, and that the plain meaning is "to extend over so as to cover partly." (*Id.*)

///

16

1    During oral argument, the parties agreed to construe the term "overlap" to mean "to

2    extend over so as to cover partly," and the Court will recommend adopting this construction.

3    **D.    Construction of "from an inlet to an outlet across the heat exchanger"**

| Term | Claims | Edelbrock's proposed construction | Whipple's *revised* proposed construction |
|------|--------|-----------------------------------|-------------------------------------------|
| From an inlet to an outlet across the heat exchanger | 1, 17 | No construction necessary – ordinary meaning | From an inlet of the heat exchanger to an outlet of the heat exchanger. |

8    The fourth disputed term comes from claims 1 and 17. The relevant portions of claims 1

9    and 17 state:

10    wherein the intercooler defines a single heat exchanger in which a heat exchange
      medium is in fluid communication ***from an inlet to an outlet across the heat***
11    ***exchanger*** and defines a flow path perpendicular to the air flow path through the
      heat exchange area

12

13    (ECF No. 44-5 at 3 (emphasis added).)

14    Edelbrock argues that no construction of this term is necessary and that it should be given

15    its ordinary meaning. (ECF No. 44 at 14-16.) Edelbrock explains that claims 1[d] and 17[e]

16    "describe a path, indicating that the dual pass heat exchanger is a single heat exchanger in which

17    'a heat exchange medium' (*e.g.* water or coolant) is in 'fluid communication from an inlet to an

      outlet across the heat exchange area.'" (*Id.* at 14.)

18    Whipple initially proposed construing the term "from an inlet to an outlet across the heat

19    exchanger," as meaning "from one of two inlets of the heat exchanger to the outlet of the heat

20    exchanger." Whipple argued, in support of that construction, that there are two disputes about the

21    term: (1) whether the fluid communication from an inlet to an outlet must be across the same

22    single heat exchanger, and (2) whether the claim should be limited to an embodiment with two

23    inlets and one outlet. (ECF No. 45 at 16-18; ECF No. 47 at 9-10.)

24    However, Whipple subsequently conceded the second dispute, both in its responsive brief

25    and during oral argument, and has dropped its proposed construction requiring the term to have

26    two inlets and one outlet. (*See* ECF No. 47 at 9.) Thus, the revised construction proposed by

27    Whipple is "from an inlet of the heat exchanger to an outlet of the heat exchanger." (ECF No. 45

28    at 16-18; ECF No. 47 at 9.)

The term as set forth in the claim is, "from an inlet to an outlet across the heat exchanger," and Whipple has not explained why or how the construction it offers—"from an inlet of the heat exchanger to an outlet of the heat exchanger," is materially different from the term or is necessary to clarify that the fluid communication from an inlet to an outlet is across a single heat exchanger. The Court therefore finds that there is no construction necessary for the term, "from an inlet to an outlet across the heat exchanger," and recommends that the term should be given its ordinary meaning.

**E.       Construction of "an inlet and an outlet of the heat exchange fluid medium"**

| Term | Claims | Edelbrock's proposed construction | Whipple's proposed construction |
|---|---|---|---|
| An inlet and an outlet of the heat exchange fluid medium | 1[g], 17[i] | No construction necessary – ordinary meaning<br><br>Alternatively, "a fluid medium inlet and outlet of the heat exchanger" | An inlet and outlet of the supercharger housing [*revised proposed construction*] |

The fifth disputed term comes from claims 1[g] and 17[i]. The relevant portions of these claims recite:

> wherein ***an inlet and an outlet of the heat exchange fluid medium*** and an inlet of the air flow through the supercharger and a supercharger pulley are on a same side[3] of the dual pass intercooled supercharger.

(ECF No. 44-5 at 3 (emphasis added) (footnote added).)

Edelbrock contends that no construction of the term is necessary and that the term should be given its ordinary meaning. Alternatively, the term should be construed to mean "a fluid medium inlet and outlet of the heat exchanger." (ECF No. 44 at 16-18.)

Whipple argues that the term should be construed as "an inlet and outlet of the supercharger housing." (ECF No. 47 at 14-16.) Whipple initially proposed a construction requiring the term to refer to water inlets/outlets, but subsequently conceded that the claim term is not limited to water. (*See id.*). Thus, the parties dispute whether the term refers to the fluid

---

[3] The parties agree that "a same side" means "a front side" of the dual pass intercooled supercharger.

inlet/outlet of the heat exchanger, as proposed by Edelbrock, or to the fluid inlet/outlet to the supercharger housing, as proposed by Whipple.

Whipple argues that its interpretation is "compelled by the claims themselves, which recite three different inlets/outlets: (1) 'an inlet to an outlet *across the heat exchanger*,' (2) 'an inlet and an outlet of the heat exchange fluid medium . . . on a same side *of the dual pass intercooled supercharger*," 'and (3) 'an inlet of the air flow through the supercharger.'" (ECF No. 45 at 20-21 (emphasis in original).) Whipple cites to the rule of construction that different terms used in a patent should be construed as having a different meaning, and argues that if Edelbrock had intended the inlet/outlet term to refer back to the previously cited inlet/outlet "across the heat exchanger," then Edelbrock would have used "the" rather than "an":

> If Edelbrock had intended to claim the same inlet/outlet of the heat exchanger found in the first element, it would (and should) have used the definite article 'the' to refer back to it. Edelbrock did not. Instead, Edelbrock introduced a separate claim element by using the indefinite article 'an' for the inlet and outlet of the heat exchange fluid medium.

(ECF No. 45 at 21-23; ECF No. 47 at 14-15 (citing *Comapter*, 596 F.3d at 1348); ECF No. 47 at 14. (citing *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010).)

Edelbrock contends that it intentionally used "an" rather than "the" in the term to leave open "the possibility that the inlets and outlets could be the same or separate inlets and outlets from those referred to in claims 1(d) and 17(e)." (ECF No. 48 at 24.) According to Edelbrock:

> This becomes important when considering dependent claim 7. That claim depends back to claim 1 through intervening claims and requires that *the* heat exchange medium inlet be "adjacent the second portion" and *the* heat exchange medium outlet be "adjacent to the first portion." The antecedent basis for claim 7 is claim 1(g), which refers to an inlet and outlet of the heat exchange medium inlet and outlet from claim 1(g) are located "adjacent" the intercooler's portions."

(ECF No. 48 at 24 (emphasis in original).) The Court finds Edelbrock's argument to be persuasive. Further, as Edelbrock notes, Whipple has not cited any law requiring a patentee to use antecedent basis to refer to the same structure in multiple limitations.

Edelbrock's proposed construction is also consistent with the structure and language of the claim itself:

1.  A dual pass intercooled supercharger, comprising:

    [a]  a housing;

    [b]  a front drive, front inlet supercharger;

    [c]  an intercooler in fluid communication with an exit of the supercharger, the intercooler configured as a dual pass heat exchanger having an airflow path from the supercharger that passes through the heat exchanger, defining a heat exchange area, more than once,

        [d]  wherein the dual pass heat exchanger is a single heat exchanger in which a heat exchange medium is in fluid communication from an inlet to an outlet across the heat exchanger and defining a flow path perpendicular to the air flow path through the heat exchange area,

        [e]  wherein the heat exchanger is configured such that the airflow path from the supercharger contacts a first portion of a heat exchange surface of the heat exchanger, leaves the heat exchange area, and reenters the heat exchange area to contact a second portion of the heat exchange surface separate from the first portion, the first portion and second portion of the intercooler overlap in a depth dimension along an air flow direction, and

        [f]  wherein the second portion comprises two second portions, one of the two second portions is on a first side of the first portion and another of the two second portions is on a second side of the first portion opposite the first [portion] side;

        [g]  wherein ***an inlet and an outlet of the heat exchange fluid medium*** and an inlet of the air flow through the supercharger and a supercharger pulley are on a same side of the dual pass intercooled supercharger; and

    [h]  a first seal to prevent air from bypassing the intercooler positioned between the first portion and the second portion of the heat exchanger.

. . . .

17. A method of compressing and cooling air to an engine intake, comprising:

    [a]  compressing the air in a front drive, front inlet supercharger;

    [b]  passing the air exiting the supercharger through a first portion of an intercooler in fluid communication with an exit of the supercharger;

    [c]  exiting the air from the first portion of the intercooler into a common chamber;

    [d]  passing the air from the common chamber through a second portion of the intercooler different from the first portion of the intercooler, the air directed in opposite directions when passing the first portion of the intercooler and when passing the second portion of the intercooler, wherein

    [e]  the intercooler defines a single heat exchanger in which a heat exchange medium is in fluid communication from an inlet to an outlet across the heat exchanger and defines a flow path perpendicular to the air flow path through the heat exchange area,

    [f]  a heat exchange medium of the intercooler is in fluid communication between the first portion and the second portion,

20

[g]  a heat exchange medium flow path through the first portion and the
second portion is perpendicular to an air flow path through the first portion
and the second portion, and

[h]  the second portion comprises two second portions, one of the two second
portions is on a first side of the first portion and another of the two second
portions is on a second side of the first portion opposite the first side and a
seal positioned between the first portion and the second portion prevents
air from bypassing the intercooler,

[i]  wherein ***an inlet and an outlet of the heat exchange fluid medium*** and an
inlet of the air flow through the supercharger and a supercharger pulley are
on a same side of the dual pass intercooled supercharger.

(ECF No. 44-5 at 3 (emphasis and paragraph lettering added).) Although claim 1[a] separately

lists the housing as a component of the dual pass intercooled supercharger, there is no discussion

of the heat exchange fluid medium inlets and outlets in this portion of the claim. Instead, the

terms at issue in claims 1[g] and 17[i] are indented and set forth in the context of the discussion of

the intercooler. (*See* ECF No. 44-5 at 3.)

Both parties additionally contend that the '481 Patent's exemplary embodiments support

their proposed claim construction. Specifically, Whipple argued at the claim construction hearing

that the phrase "inlet and outlet of the heat exchange fluid medium" must refer to the inlets and

outlets to the supercharger housing because the '481 Patent described the exemplary embodiment

in Figure 5 as having the air inlet 52, water inlet 56, and water outlet 58 positioned on the same

side of the housing. (ECF No. 54 at 27, 31; *see also* ECF No. 44-2 at 7.) Edelbrock, in contrast,

pointed to the '481 Patent's Figure 6 to demonstrate that phrase "inlet and outlet of the heat

exchange fluid medium" refers to the heat exchanger because Figure 6 refers to fluid medium

inlets 56a and 56b and outlet 58 in the context of the heat exchanger. (ECF No. 54 at 33-36, 42;

*see also* ECF No. 44-2 at 8.) The specification's exemplary embodiments accordingly do not

resolve the issue as they refer to the heat exchange fluid medium inlets and outlets of both the

supercharger housing and the heat exchanger.

It is therefore important to look at the context of the language at issue in claims 1[g] and

17[i]:

wherein ***an inlet and an outlet of the heat exchange fluid medium*** and an inlet of
the air flow through the supercharger and a supercharger pulley are on a same side
of the dual pass intercooled supercharger.

(ECF No. 44-5 at 3 (emphasis added).) The claims identify what must be on the same side of the

dual pass intercooled supercharger: (1) an inlet and outlet of the heat exchange fluid medium; (3)

21

an air inlet; and (3) the supercharger pulley. In other words, the thing that has to be on the same side of the air inlet and the pulley is either an inlet/outlet to the supercharger housing or an inlet/outlet to the heat exchanger.

The Court notes that often it can be both. It seems likely that the heat exchange fluid medium may enter and exit the housing on the same side as it enters and exits the heat exchanger, and that in such cases both sets of inlets and outlets are (or are not) on the same side of the supercharger as the air inlet and the pulley. However, Whipple's proposed claim construction implicitly poses a question: what if the heat exchange fluid medium inlets and outlets to the supercharger housing are not on the same side as the inlets and outlets of the heat exchanger? What if, for example, the heat exchange fluid medium enters the housing of the supercharger on one side and then is diverted to another side of the device before entering the heat exchanger? Which is the relevant inlet and outlet that must be on the same side of the dual pass intercooled supercharger as the air inlet and the pulley?

To construe these terms, it is therefore important to see how these claims arose. Indeed, Whipple contends that the prosecution history, and specifically, Edelbrock's arguments on reexamination, show that Edelbrock disclaimed its requested construction in favor of Whipple's proposed construction. (ECF No. 45 at 22-23; ECF No. 47 at 15-16.)  However, the '481 Patent's prosecution history does not establish that Edelbrock demonstrated a "clear and unmistakable" intent to disavow or disclaim the heat exchanger from the meaning of the claim terms at issue and limit the fluid exchange medium inlets and outlets to the supercharger housing as Whipple contends. *Cordis Corp.*, 561 F.3d at 1329. According to the prosecution history, claims 1[g] and 17[i] were added to the '481 Patent as part of the reexamination in order to distinguish the '481 Patent from one particular prior art, Callaway. It was important to the USPTO that the '481 Patent, unlike Callaway, required the heat exchange fluid medium inlet and outlet to be on the same side of the supercharger as the pulley and the air inlet. The decisive issue is therefore which of the fluid medium inlets and outlets the USPTO focused on as differentiating the '481 Patent from Callaway. The prosecution history reveals that the patent examiner considered the location of the fluid medium inlets and outlets to the intercooler heat exchanger, and not the inlets and outlets to the housing, to be the crucial distinguishing factor.

22

1    After the USPTO issued a final rejection following Whipple's request for reexamination,

2    Edelbrock submitted proposed claim amendments incorporating the disputed terms from what

3    was former claim 16 into independent claims 1 and 17. (ECF No. 48-11.) Edelbrock's remarks in

4    support of the proposed amendments noted that the USPTO cited to Callaway in support of its

5    rejection, "including the position of the supercharger pulley, air inlet to the supercharger, and the

6    fluid medium inlet and outlet of the **heat exchanger**." (*Id.* at 10 (emphasis added).) Specifically,

7    the USPTO asserted that "[p]age 12 of Callaway states that water manifold 10 controls the in/out

8    flow of water between each **intercooler assembly** 13. Figure 4 shows the manifold, as well as the

9    drive pulley and the air inlet at the front of the unit." (ECF No. 48-10 at 8 (emphasis added); ECF

10   No. 48-11 at 10; *see also* ECF No. 45-5 at 15, 29.) Edelbrock explained that Callaway's water

11   manifold 10 "does not disclose the actual inlet and outlet of the water **to the intercooler** as

12   claimed." (ECF No. 48-11 at 11 (emphasis added).) Instead, when viewed from the side as

13   illustrated in Callaway's Figure 5, "the tubing 7 to and from these manifolds is clearly shown

14   including the actual inlet and outlets to the **housing of the supercharger and the intercooler**."

15   (*Id.* (emphasis added).) Further, Callaway actually described water flowing "via a plurality of

16   outgoing and returning tubing 7 . . . to each respective **intercooler assembly 13, 13, 14**." (*Id.*

17   (emphasis added); *see also* ECF No. 45-5 at 15, 33.) Therefore, Edelbrock argued that the inlet

18   and outlet of the fluid medium in Callaway were actually positioned on the back side of the

19   supercharger and on the opposite side of the pulley and air inlet to the supercharger. (48-11 at 10.)

20        The USPTO agreed with Edelbrock and found the amended claims patentable. (ECF No.

21   48-12.) The examiner reasoned that the external water ports shown in Callaway's Figure 11 "are

22   not heat exchange medium inlets and outlets." (*Id.* at 6.) Instead "[t]he coolant enters and leaves

23   **the intercooler heat exchanger** through ports on the opposite side of the engine, as seen in

24   figures 4 and 5." (*Id.* at 6-7 (emphasis added); *see also* ECF No. 45-5 at 29-30, 35.) In other

25   words, in order to distinguish the '481 Patent from Callaway and find the amended claims

26   patentable, the examiner explicitly said it was the fluid medium inlets and outlets to the heat

27   exchanger that were critical. The examiner further noted that:

         [w]hile it was earlier stated . . . that it would have been obvious to move the inlet
28       and outlet of the cooling fluid to the front of the engine to make the ports closer to
         the fluid source to reduce piping, this is no longer seen as true, as both the
         YouTube video and Callaway use radiators and fluid storage tanks on the front of

1
2

the engine compartment, yet route the coolant to the back of the engine to **enter the intercooler**. A cursory search for **an intercooler** having the drive pulley as well as a cooling fluid inlet and outlet on the front of the supercharger failed to provide a showing of this configuration.

3

(ECF No. 48-12 at 7 (emphasis added).)

4

5

6

7

8

9

10

11

12

13

While much of the reexamination discussion used the term "intercooler" rather than "heat exchanger," it is worth noting that Edelbrock's proposed construction uses "heat exchanger" and not "intercooler." Although both Edelbrock and the patent examiner frequently used the term intercooler in discussing the relevant claims, the patent examiner also used the term "intercooler heat exchanger" in distinguishing the '481 Patent from Callaway. The '481 Patent also describes the intercooler as being "configured as a dual pass heat exchanger" and states that "the intercooler defines a single heat exchanger[.]" (ECF No. 44-5 at 3.) Therefore, the use of the term "intercooler" in the relevant prosecution history appears to also refer to the "heat exchanger." It accordingly follows that the inlets and outlets of the heat exchange fluid medium described in claims 1[g] and 17[i] are not the inlets and outlets to the housing, but the inlets and outlets to the heat exchanger.

14

15

16

17

18

19

20

21

The intrinsic evidence indicates that there was a clearly expressed intent to define the fluid medium inlets and outlets described in claims 1[g] and 17[i] as referring to an inlet and outlet of the heat exchanger. Reading the claim terms not only in the context of the particular claim in which the disputed terms appear, but also in the context of the entire patent and the prosecution history, indicates that the disputed terms refer to the fluid medium inlets and outlets of the heat exchanger. Therefore, the Court recommends construing "an inlet and an outlet of the heat exchange fluid medium" as set forth in claims 1[g] and 17[i] as "a fluid medium inlet and outlet of the heat exchanger."

22

## VI.    FINDINGS AND RECOMMENDATIONS

23

For the reasons set forth above, the Court recommends that:

24

25

1.      The following terms set forth in claims 1 and 17 of the '481 Patent be construed pursuant to the agreement of the parties (ECF No. 40):

26

27

a.      "an/the intercooler" be construed as "a/the cooling device;"

b.      "a single heat exchanger" be construed as "one heat exchanger;"

28

      c.      "on a same side of the dual pass intercooled supercharger' be construed as "on a front side of the dual pass intercooled supercharger";

2.      The term "overlap" set forth in claim 1 of the '481 Patent be construed to mean "to extend over so as to cover partly" pursuant to the parties' agreement at the claim construction hearing;

3.      The terms "a first portion of a heat exchange surface of the heat exchanger" and "a second portion of the heat exchange surface" set forth in claim 1 of the '481 Patent and the term "from an inlet to an outlet across the heat exchanger" set forth in claims 1 and 17 of the '481 Patent do not require construction and should be given their ordinary meaning;

4.      The term "an inlet and an outlet of the heat exchange fluid medium" be construed as "a fluid medium inlet and outlet of the heat exchanger;" and

5.      The parties be directed to submit a joint status report regarding further scheduling to the undersigned within twenty-one (21) days of an order adopting these findings and recommendations.

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **February 1, 2021**        /s/ Erica P. Grosjean

                                    UNITED STATES MAGISTRATE JUDGE